UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
JACKSONVILLE DIVISION


UNITED STATES OF AMERICA

v.                                              Case No. 3:15-cr-112-J-39PDB

JASON DEAN BARNES
_____/

EXHIBIT TWO
United States District Court for the Middle District of Florida Search Warrant,
3:15-mj-1130-MCR and United States District Court for the Middle District of Florida
Application For Search Warrant.

AO 93 (Rev. 12/09) Search and Seizure Warrant

# UNITED STATES DISTRICT COURT

for the

Middle District of Florida

| | |
|---|---|
| In the Matter of the Search of<br>*(Briefly describe the property to be searched<br>or identify the person by name and address)*<br><br>a residence located at 6953 Solomon Road,<br>Jacksonville, Florida 32234, more particularly<br>described in Attachment A | )<br>)<br>)  Case No.   3:15-mj-(130-MCR<br>)<br>)<br>) |

## SEARCH AND SEIZURE WARRANT

To:     Any authorized law enforcement officer

An application by a federal law enforcement officer or an attorney for the government requests the search of the following person or property located in the _____ Middle _____ District of _____ Florida _____
*(Identify the person or describe the property to be searched and give its location):*

a residence located at 6953 Solomon Road, Jacksonville, Florida 32234, more particularly decribed in Attachment A.

The person or property to be searched, described above, is believed to conceal *(identify the person or describe the property to be seized):*
See Attachment B.

I find that the affidavit(s), or any recorded testimony, establish probable cause to search and seize the person or property.

**YOU ARE COMMANDED** to execute this warrant on or before     *Aug 7 2015*
                                                                                          *(not to exceed 14 days)*

☐ in the daytime  6:00 a.m. to 10 p.m.     ☑ at any time, day or night without being required to give prior notice, that is, without being
                                                                   required to "knock and announce," as I find reasonable cause has been established.

Unless delayed notice is authorized below, you must give a copy of the warrant and a receipt for the property taken to the person from whom, or from whose premises, the property was taken, or leave the copy and receipt at the place where the property was taken.

The officer executing this warrant, or an officer present during the execution of the warrant must prepare an inventory as required by law and promptly return this warrant and inventory to United States Magistrate Judge
Monte C. Richardson _____ .
                              *(name)*

☐ I find that immediate notification may have an adverse result listed in 18 U.S.C. § 2705 (except for delay of trial), and authorize the officer executing this warrant to delay notice to the person who, or whose property, will be searched or seized *(check the appropriate box)*   ☐ for _____ days *(not to exceed 30)*.
                                                                                              ☐ until, the facts justifying, the later specific date of _____ .

Date and time issued:   *7/27/15 a 3:22 p.m.*        *[signature] Monte C.* _____
                                                                                                          *Judge's signature*

City and state:   Jacksonville, Florida _____     Monte C. Richardson, United States Magistrate Judge
                                                                                                 *Printed name and title*

CERTIFIED A TRUE COPY
SHERYL L LOESCH, CLERK
U.S. DISTRICT COURT
Deputy Clerk

AO 93 (Rev. 12/09) Search and Seizure Warrant (Page 2)

| Return | | |
|---|---|---|
| Case No.: 3:15-mj- | Date and time warrant executed: 7/29/2015 | Copy of warrant and inventory left with: CHRISTY BARNES |
| Inventory made in the presence of : CHRISTY BARNES | | |
| Inventory of the property taken and name of any person(s) seized: | | |

SEE ATTACHED INVENTORY

### Certification

I declare under penalty of perjury that this inventory is correct and was returned along with the original warrant to the designated judge.

Date: 8/6/2015

_____
Executing officer's signature

SA LAWRENCE S. MEYER
Printed name and title

**ATTACHMENT A**

**PREMISES TO BE SEARCHED**

The residence located at 6953 Solomon Road, Jacksonville, Florida 32234 is a "single wide" prefabricated, single story structure of the type often referred to as a mobile home. The exterior walls are comprised of vertical white vinyl panels over three tan colored horizontal panels which define the lower edge of the exterior walls. Four wooden steps lead up to a porch which runs along about two-thirds length of the home. The front door is tan in color and is offset to the right of center as one observes the residence from the road. To the immediate right of the door is a porch light. To the right of the door is a window flanked by tan colored shutters. A porch swing is located in front of this window. To the left of the front door are two double pane windows, each bordered by tan colored shutters. Further to the left is another set of double windows. Decorative split rail fences are in front of the residence with a break between the two fence sections to allow access to the steps leading to the front porch and door. A brown colored, three rail wood fence encloses the yard. Two large leafy trees grow in the front yard. Though there is no discernible driveway, in the front yard alongside the road is a black rural style mailbox mounted on an unfinished wooden post. Affixed to one side of the mailbox are the numbers "6953." Solomon Road is a two lane dirt road along this section of roadway.

**ATTACHMENT B**

**LIST OF ITEMS TO BE SEIZED AND SEARCHED**

1.     Any and all computer(s), computer hardware, computer software, electronic storage media (including any and all disk drives, compact disks, flash drives, cellular telephones, "smart" phones (such as an Apple iPhone), electronic tablets (such as an Apple iPad), personal digital assistants (PDA), digital cameras and/or memory cards, or any other device capable of electronic storage of data and/or images), computer-related documentation, computer passwords and data-security devices, videotapes, video-recording devices, video-recording players, and video display monitors that are or may be used to:  visually depict child pornography or child erotica; display or access information pertaining to a sexual interest in child pornography; display or access information pertaining to sexual activity with children; or possess and/or access with intent to view child pornography or child erotica.

2.     Any and all computer software, including programs to run operating systems, applications, such as word processing, graphics, and communications programs, including peer-to-peer software, that may be or are used to: visually depict child pornography or child erotica, display or access information pertaining to a sexual interest in child pornography; display or access information pertaining to sexual activity with children; or possess and/or access with intent to view child pornography or child erotica.

3.     For any computer or storage medium whose seizure is otherwise authorized by this warrant, and any computer or storage medium that contains or in

which is stored records or information that is otherwise called for by this warrant (hereinafter, "COMPUTER"):

      a.    evidence of who used, owned, or controlled the COMPUTER at the time the things described in this warrant were created, edited, or deleted, such as logs, registry entries, configuration files, saved usernames and passwords, documents, browsing history, user profiles, email, email contacts, "chat," instant messaging logs, photographs, and correspondence;

      b.    evidence of software that would allow others to control the COMPUTER, such as viruses, Trojan horses, and other forms of malicious software, as well as evidence of the presence or absence of security software designed to detect malicious software;

      c.    evidence of the lack of such malicious software;

      d.    evidence indicating how and when the computer was accessed or used to determine the chronological context of computer access, use, and events relating to crime under investigation and to the computer user;

      e.    evidence indicating the computer user's state of mind as it relates to the crime under investigation;

      f.    evidence of the attachment to the COMPUTER of other storage devices or similar containers for electronic evidence;

      g.    evidence of counter-forensic programs (and associated data) that are designed to eliminate data from the COMPUTER;

      h.    evidence of the times the COMPUTER was used;

i.     passwords, encryption keys, and other access devices that may be necessary to access the COMPUTER;

j.     documentation and manuals that may be necessary to access the COMPUTER or to conduct a forensic examination of the COMPUTER;

k.     records of or information about Internet Protocol addresses used by the COMPUTER; and

l.     records of or information about the COMPUTER's Internet activity, including firewall logs, caches, browser history and cookies, "bookmarked" or "favorite" web pages, search terms that the user entered into any Internet search engine, and records of user-typed web addresses.

4.     All routers, modems, and network equipment used to connect computers and/or computer media together and/or to connect computers to the internet, including any programs, protocols, and/or other digital information contained therein;

5.     Any and all notes, documents, records, or correspondence, in any format and medium (including envelopes, letters, papers, email messages, chat logs and electronic messages, and handwritten notes) pertaining to the possession and/or access with intent to view child pornography as defined in 18 U.S.C. § 2256(8) or to the possession and/or access with intent to view visual depictions of minors engaged in sexually explicit conduct as defined in 18 U.S.C. § 2256(2).

6.     In any format and medium, all originals, computer files, copies, and negatives of child pornography as defined in 18 U.S.C. § 2256(8), visual depictions of minors engaged in sexually explicit conduct as defined in 18 U.S.C. § 2256(2), or child erotica.

3

7.    Any and all diaries or address books containing names or lists of names and addresses of individuals who have been contacted by use of the computer(s) or by other means for the purpose of possessing and/or accessing with intent to view child pornography as defined in 18 U.S.C. § 2256(8) or visual depictions of minors engaged in sexually explicit conduct as defined in 18 U.S.C. § 2256(2).

8.    Any and all notes, documents, records, or correspondence, in any format or medium (including envelopes, letters, papers, email messages, chat logs and electronic messages, and handwritten notes), identifying persons transmitting, possessing and/or accessing with intent to view, through interstate or foreign commerce by any means (including the United States Mail or computer) any child pornography as defined in 18 U.S.C. § 2256(8) or any visual depictions of minors engaged in sexually explicit conduct, as defined in 18 U.S.C. § 2256(2).

9.    Any and all notes, documents, records, or correspondence, in any format or medium (including envelopes, letters, papers, email messages, chat logs and electronic messages, other digital data files and web cache information) concerning the possession and/or accessing with intent to view child pornography as defined in 18 U.S.C. § 2256(8) or visual depictions of minors engaged in sexually explicit conduct, as defined in 18 U.S.C. § 2256(2).

10.    Any and all notes, documents, records, or correspondence, in any format or medium (including envelopes, letters, papers, email messages, chat logs and electronic messages, and other digital data files) concerning communications between individuals about child pornography or the existence of sites on the Internet that contain child pornography or that cater to those with an interest in child pornography.

4

11.     Any and all notes, documents, records, or correspondence, in any format or medium (including envelopes, letters, papers, email messages, chat logs and electronic messages, and other digital data files) concerning membership in online groups, clubs, or services that provide or make accessible child pornography to members.

12.     Any and all records, documents, invoices and materials, in any format or medium (including envelopes, letters, papers, email messages, chat logs and electronic messages, and other digital data files) that concern any accounts with an internet service provider.

13.     Any and all records, documents, invoices and materials, in any format or medium (including envelopes, letters, papers, email messages, chat logs and electronic messages, and other digital data files) that concern online storage or other remote computer storage, including software used to access such online storage or remote computer storage, user logs or archived data that show connection to such online storage or remote computer storage, and user logins and passwords for such online storage or remote computer storage

14.     Any and all cameras, film, videotapes or other photographic equipment capable of being used to possess, store and/or conceal visual depictions of minors engaged in sexually explicit conduct as defined in 18 U.S.C. § 2256(2).

15.     Any and all address books, mailing lists, supplier lists, mailing address labels, and any and all documents and records, in any format or medium (including envelopes, letters, papers, email messages, chat logs and electronic messages, and other digital data files), pertaining to the preparation, purchase, and acquisition of

5

names or lists of names to be used in connection with the possession and/or access with intent to view, through interstate or foreign commerce by any means (including the United States Mail or computer) any child pornography as defined in 18 U.S.C. § 2256(8) or any visual depiction of minors engaged in sexually explicit conduct, as defined in 18 U.S.C. § 2256(2).

16.     Any and all documents, records, or correspondence, in any format or medium (including envelopes, letters, papers, email messages, chat logs and electronic messages, and other digital data files), pertaining to occupancy or ownership of the premises to be searched, including rental or lease agreements, mortgage documents, rental or lease payments, utility and telephone bills, mail envelopes, or addressed correspondence.

17.     Any and all diaries, notebooks, notes, and any other records reflecting personal contact and any other activities with minors visually depicted while engaged in sexually explicit conduct, as defined in 18 U.S.C. § 2256(2).

18.     Any and all documents, records, or correspondence, in any format or medium (including envelopes, letters, papers, email messages, chat logs and electronic messages, and other digital data files), pertaining to the identity of any and all owners and/or users of any computers, computer media and any electronic storage devices discovered in the subject premises and capable of being used to possess, access with intent to view, store and/or conceal visual depictions of minors engaged in sexually explicit conduct as defined in 18 U.S.C. § 2256(2).

As used above, the terms "records" and "information" includes all forms of creation or storage, including any form of computer or electronic storage (such as hard

6

disks or other media that can store data); any handmade form (such as writing); any mechanical form (such as printing or typing); and any photographic form (such as microfilm, microfiche, prints, slides, negatives, videotapes, motion pictures, or photocopies).

The term "computer" includes all types of electronic, magnetic, optical, electrochemical, or other high speed data processing devices performing logical, arithmetic, or storage functions, including desktop computers, notebook computers, mobile phones, smart phones, tablets, server computers, and network hardware.

The term "storage medium" includes any physical object upon which computer data can be recorded. Examples include hard disks, RAM, floppy disks, flash memory, CD-ROMs, and other magnetic or optical media.

7

FD-597 (Rev 8-11-94)

**UNITED STATES DEPARTMENT OF JUSTICE**
**FEDERAL BUREAU OF INVESTIGATION**
Receipt for Property Received/Returned/Released/Seized

File # 3056-JK-6396250

On (date) 7/29/15

item(s) listed below were:
☐ Received From
☐ Returned To
☐ Released To
☑ Seized

(Name)  CRISTY BARNES

(Street Address)  6953 Solomon RD

(City)  JACKSONVILLE , FL  32234

Description of Item(s): (2) CDS; (1) 2GB Kingston SD card; (1) Cisco Router, SN: 1231DC6423D567; Sony cyber shot camera; RainDigital Recorder; (1) Sandisk Cruzer Glide 16GB; (1) Gorilla thumbdrive; (1) DVD video camera w/ bag & battery; (1) iPod w/ plastic case; and Toshiba satellite laptop SN: 1D0625964L w/ power cord.

Received By: _____
(Signature)

Received From: Cristy Barnes
(Signature)

AO 106 (Rev. 04/10)  Application for a Search Warrant



# UNITED STATES DISTRICT COURT

### for the

Middle District of Florida

| | |
|---|---|
| In the Matter of the Search of<br>*(Briefly describe the property to be searched<br>or identify the person by name and address)*<br><br>a residence located at 6953 Solomon Road,<br>Jacksonville, Florida 32234, more particularly<br>described in Attachment A | )<br>)<br>)<br>)<br>)<br>) |

Case No. 3:15-mj- *1130-MCR*

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location):*

a residence located at 6953 Solomon Road, Jacksonville, Florida 32234, more particularly described in Attachment A.

located in the _____ Middle _____ District of _____ Florida _____, there is now concealed *(identify the person or describe the property to be seized):*
See Attachment B.

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more):*

☑ evidence of a crime;

☑ contraband, fruits of crime, or other items illegally possessed;

☑ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. 2252 & 2252A | Receipt, and possession of child pornography. |

The application is based on these facts:

See attached Affidavit.

☑ Continued on the attached sheet.

☐ Delayed notice of _____ days (give exact ending date if more than 30 days: _____ ) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

_____
*Applicant's signature*

Federal Bureau of Investigation Special Agent Lawrence S. Meyer
*Printed name and title*

Sworn to before me and signed in my presence.

Date: 7/27/15

_____
*Judge's signature*

City and state:  Jacksonville, Florida

Monte C. Richardson, United States Magistrate Judge
*Printed name and title*

## AFFIDAVIT IN SUPPORT OF A SEARCH WARRANT

I, Lawrence S. Meyer, being duly sworn, state as follows:

### INTRODUCTION

1.     I am a Special Agent (SA) with the Federal Bureau of Investigation (FBI) and have been employed as such since January 1987.  Since December 2006, I have been assigned to investigate matters involving the sexual exploitation of children through the use of the Internet.  Prior to this assignment, I have served as a supervisor of the Violent Crime Squad, Joint Terrorism Task Force and the Counterintelligence Squad at the Jacksonville Field Office of the FBI.  I have a Bachelor's degree in Biology and a Master's degree in Adult Education and Human Resource Development.  I have received law enforcement training from the FBI Academy at Quantico, Virginia.  I have also received training on various aspects of crimes involving children as victims and Internet investigations.  I have received training and have a user certificate to conduct Peer-to-Peer (P2P) investigations using a program to identify individuals who distribute child sexual abuse images.  I am currently assigned to the Violent Crimes/Child Exploitation Squad, Jacksonville Field Office, of the FBI and serve as coordinator for the FBI Jacksonville Child Exploitation Task Force, which is comprised of federal, state and local law enforcement agents/officers conducting investigations involving persons who are, among other things, trafficking in and sharing child pornography via the Internet and soliciting children to produce sexually explicit images.  During the performance of my duties, I have investigated and assisted in the investigation of matters involving the possession, collection, production, receipt, and/or transportation of images of child pornography and the solicitation and extortion of children to produce sexually explicit

images of themselves.  I have been involved in searches of residences pertaining to the possession, collection, production, and/or transportation of child pornography through either the execution of search warrants or through the subject providing written consent to permit a search to be conducted.  Specifically, I have investigated and assisted in the prosecution of cases in which persons have used the Internet to have online contact with minors and to entice such minors to produce images and videos of themselves for distribution to the subject persons.

2.     I have investigated and assisted in the investigation of criminal matters involving the sexual exploitation of children, which constituted violations of Title 18, United States Code, Sections 2251, 2252 and 2252A, as well as Florida state statutes which criminalize the production, receipt, transportation, access with intent to view, and possession of child pornography, that is, visual images depicting minors engaged in sexually explicit conduct.

3.     The statements contained in this affidavit are based on my personal knowledge as well as on information provided to me by other law enforcement officers, including written information and conversations with FBI SA Daniel I. Alfin, whom I know to be assigned to the Major Case Coordination Unit (MCCU), Violent Crimes Against Children Section, Criminal Investigative Division at FBI Headquarters.  It is also based on the following:  written reports about this and other investigations that I have received, directly or indirectly; information gathered from the service of administrative subpoenas; the results of physical and electronic surveillance conducted by law enforcement agents; independent investigation and analysis by FBI agents/analysts and computer forensic professionals; and my experience, training and background as an FBI Special

2

Agent. This affidavit is being submitted for the limited purpose of securing a search warrant, and I have not included each and every fact known to me concerning this investigation. I have set forth only the facts that I believe are necessary to establish probable cause to believe evidence of violations of Title 18, United States Code, Sections 2252 and/or 2252A, is present in the premises and items to be searched.

## STATUTORY AUTHORITY

4.      This investigation concerns alleged violations of Title 18, United States Code, Sections 2252 and 2252A, relating to material involving the sexual exploitation of minors. Based upon my training and experience, as well as conversations with other experienced law enforcement officers, computer forensic examiners, and Assistant United States Attorneys, I know the following:

a.      18 U.S.C. §§ 2252(a)(4)(B) and (b)(2) prohibits a person from knowingly possessing, accessing with intent to view, or conspiring or attempting to access with intent to view any matter which contains a visual depiction that has been mailed, or shipped, or transported using any means or facility of interstate or foreign commerce, or in or affecting interstate or foreign commerce, or was produced using materials that have been mailed, shipped, or transported in such commerce, by any means including by computer, if the visual depiction involved the use of a minor engaging in sexually explicit conduct and such visual depiction is of such conduct; and

b.      18 U.S.C. §§ 2252A(a)(5)(B) and (b)(2) prohibits a person from knowingly possessing or knowingly accessing with intent to view, or attempting to do so, any material that contains an image of child pornography, as defined in 18 U.S.C. § 2256(8), that has been mailed, or shipped or transported using any means or facility of

3

interstate or foreign commerce or in or affecting interstate or foreign commerce by any means, including by computer, or that was produced using materials that have been mailed or shipped or transported in or affecting interstate or foreign commerce by any means, including by computer.

## DEFINITIONS

5.      The following definitions apply to this Affidavit:

a.      "Child erotica," as used herein, means materials or items that are sexually arousing to persons having a sexual interest in minors but that are not, in and of themselves, illegal or that do not necessarily depict minors in sexually explicit poses or positions.

b.      "Child pornography," as used herein, includes the definitions in 18 U.S.C. §§ 2256(8) and 2256(9) (any visual depiction of sexually explicit conduct where (a) the production of the visual depiction involved the use of a minor engaged in sexually explicit conduct, (b) the visual depiction is a digital image, computer image, or computer generated image that is, or is indistinguishable from, that of a minor engaged in sexually explicit conduct, or (c) the visual depiction has been created, adapted, or modified to appear that an identifiable minor is engaged in sexually explicit conduct). See 18 U.S.C. §§ 2252 and 2256(2).

c.      "Visual depictions" include undeveloped film and videotape, data stored on computer disk or by electronic means which is capable of conversion into a visual image, and data which is capable of conversion into a visual image that has been transmitted by any means, whether or not stored in permanent format. See 18 U.S.C. § 2256(5).

4

d.    "Sexually explicit conduct" means actual or simulated (a) sexual intercourse, including genital genital, oral-genital, anal-genital, or oral-anal, whether between persons of the same or opposite sex; (b) bestiality; (c) masturbation; (d) sadistic or masochistic abuse; or (e) lascivious exhibition of the genitals or pubic area of any persons. See 18 U.S.C. § 2256(2).

e.    "Computer," as used herein, is defined pursuant to 18 U.S.C. § 1030(e)(1), as "an electronic, magnetic, optical, electrochemical, or other high speed data processing device performing logical, arithmetic or storage functions, and includes any data storage facility or communications facility directly related to or operating in conjunction with such device."

f.    "Computer hardware," as used herein, consists of all equipment which can receive, capture, collect, analyze, create, display, convert, store, conceal, or transmit electronic, magnetic, or similar computer impulses or data.  Computer hardware includes any data processing devices (including, but not limited to, central processing units, internal and peripheral storage devices such as fixed disks, external hard drives, floppy disk drives and diskettes, and other memory storage devices); peripheral input/output devices (including, but not limited to, keyboards, printers, video display monitors, and related communications devices such as cables and connections), as well as any devices, mechanisms, or parts that can be used to restrict access to computer hardware (including, but not limited to, physical keys and locks).

g.    "Computer software," as used herein, is digital information which can be interpreted by a computer and any of its related components to direct the way

5

they work. Computer software is stored in electronic, magnetic, or other digital form. It commonly includes programs to run operating systems, applications, and utilities.

h.    The terms "records," "documents," and "materials," as used herein, include all information recorded in any form, visual or aural, and by any means, whether in handmade form (including, but not limited to, writings, drawings, paintings), photographic form (including, but not limited to, microfilm, microfiche, prints, slides, negatives, videotapes, motion pictures, photocopies), mechanical form (including, but not limited to, phonograph records, printing, typing) or electrical, electronic or magnetic form (including, but not limited to, tape recordings, cassettes, compact discs, electronic or magnetic storage devices such as floppy diskettes, hard disk drives, CD-ROMs, digital video disks (DVDs), multimedia cards (MMCs), memory sticks, USB or "thumb" drives, optical disks, printer buffers, smart cards, memory calculators, electronic dialers, or electronic notebooks, as well as digital data files and printouts or readouts from any magnetic, electrical or electronic storage device).

i.    "Computer passwords and data security devices," as used herein, consist of information or items designed to restrict access to or hide computer software, documentation, or data. Data security devices may consist of hardware, software, or other programming code. A password (a string of alpha numeric characters) usually operates a sort of digital key to "unlock" particular data security devices. Data security hardware may include encryption devices, chips, and circuit boards. Digitally coded data security software may include programming code that creates "test" keys or "hot" keys, which perform certain pre-set security functions when touched. Data security

6

software or code may also encrypt, compress, hide, or "boobytrap" protected data to make it inaccessible or unusable, as well as reverse the progress to restore it.

j.      "Internet Protocol address" or "IP address" refers to a unique number used by a computer to access the Internet and is associated with a physical address. IP addresses can be dynamic, meaning that the Internet Service Provider (ISP) assigns a unique and different number to a computer every time it accesses the Internet. IP addresses might also be static, if an ISP assigns a user's computer a particular IP address which is used each time the computer accesses the Internet.

k.      "Bulletin Board" means an Internet-based website that is either secured (accessible with a password) or unsecured, and provides members with the ability to view postings by other members and make postings themselves.  Postings can contain text messages, still images, video images, or web addresses that direct other members to specific content the poster wishes.  Bulletin boards are also referred to as "internet forums" or "message boards." A "post" or "posting" is a single message posted by a user.  Users of a bulletin board may post messages in reply to a post.  A message "thread," often labeled a "topic," refers to a linked series of posts and reply messages. Message threads or topics often contain a title, which is generally selected by the user who posted the first message of the thread.  Bulletin boards often also provide the ability for members to communicate on a one to-one basis through "private messages." Private messages are similar to e mail messages that are sent between two members of a bulletin board.  They are accessible only by the user who sent/received such a message, or by the Website Administrator.

7

l.      "Chat" refers to any kind of communication over the Internet that offers a real-time transmission of text messages from sender to receiver.  Chat messages are generally short in order to enable other participants to respond quickly and in a format that resembles an oral conversation.  This feature distinguishes chatting from other text-based online communications such as Internet forums and email.

m.      "Computer Server" or "Server," as used herein, is a computer that is attached to a dedicated network and serves many users.  A web server, for example, is a computer which hosts the data associated with a website.  That web server receives requests from a user and delivers information from the server to the user's computer via the Internet.  A domain name system (DNS) server, in essence, is a computer on the Internet that routes communications when a user types a domain name, such as www.cnn.com, into his or her web browser.  Essentially, the domain name must be translated into an IP address so the computer hosting the website may be located, and the DNS server provides this function.

n.      "File Transfer Protocol" (FTP), as used herein, is a standard network protocol used to transfer computer files from one host to another over a computer network, such as the Internet.  FTP is built on client-server architecture and uses separate control and data connections between the client and the server.

o.      "Host Name" is a name assigned to a device connected to a computer network that is used to identify the device in various forms of electronic communication, such as communications over the Internet.

8

p.      "Hyperlink" refers to an item on a web page which, when selected, transfers the user directly to another location in a hypertext document or to some other web page.

q.      "Internet Service Providers" (ISP), as used herein, are commercial organizations that are in business to provide individuals and businesses access to the Internet. ISPs provide a range of functions for their customers including access to the Internet, web hosting, e-mail, remote storage, and co-location of computers and other communications equipment. ISPs can offer a range of options in providing access to the Internet including telephone based dial-up, broadband based access via digital subscriber line (DSL) or cable television, dedicated circuits, or satellite based subscription. ISPs typically charge a fee based upon the type of connection and volume of data, called bandwidth, which the connection supports. Many ISPs assign each subscriber an account name – a user name or screen name, an "e-mail address," an e-mail mailbox, and a personal password selected by the subscriber. By using a computer equipped with a modem, the subscriber can establish communication with an Internet Service Provider (ISP) over a telephone line, through a cable system or via satellite, and can access the Internet by using his or her account name and personal password.

r.      Media Access Control (MAC) address. The equipment that connects a computer to a network is commonly referred to as a network adapter. Most network adapters have a MAC address assigned by the manufacturer of the adapter that is designed as a unique identifying number. A unique MAC address allows for proper routing of communications on a network. Because the MAC address does not

9

change and is intended to be unique, a MAC address can allow law enforcement to identify whether communications sent or received at different times are associated with the same adapter.

s.    "Secure Shell" (SSH), as used herein, is a security protocol for logging into a remote server. SSH provides an encrypted session for transferring files and executing server programs.

t.    "URL" is an abbreviation for Uniform Resource Locator and is another name for a web address. URLs are made of letters, numbers, and other symbols in a standard form. People use them on computers by clicking a pre-prepared link or typing or copying and pasting one into a web browser to make the computer fetch and show some specific resource (usually a web page) from another computer (web server) on the Internet.

u.    "Website" consists of textual pages of information and associated graphic images. The textual information is stored in a specific format known as Hyper-Text Mark-up Language (HTML) and is transmitted from web servers to various web clients via Hyper-Text Transport Protocol (HTTP).

## COMPUTERS AND CHILD PORNOGRAPHY

6.    Based upon my training and experience, as well as conversations with other experienced law enforcement officers and computer forensic examiners, I know that computers and computer technology have revolutionized the way in which individuals interested in child pornography interact with each other. In the past, child pornography was produced using cameras and film (either still photography or movies). The photographs required darkroom facilities and significant skill to develop and

10

reproduce the images.  There were definable costs involved with the production of pornographic images, and to distribute these images on any scale required significant resources and significant risks.  The photographs themselves were somewhat bulky and required secure storage to prevent their exposure to the public and/or law enforcement. The distribution of these wares was accomplished through a combination of personal contacts, mailings and telephone calls.

7.      The development of computers has radically changed the way that child pornographers manufacture, obtain, distribute and store their contraband.  Computers basically serve five functions in connection with child pornography: access, production, communication, distribution, and storage.

8.      Child pornographers can now convert paper photographs taken with a traditional camera (using ordinary film) into a computer readable format with a device known as a scanner.  Moreover, with the advent, proliferation and widespread use of digital cameras, images and videos can now be transferred directly from a digital camera onto a computer using a connection known as a USB cable or other device.[1] Digital cameras have the capacity to store images and videos indefinitely, and memory storage cards used in these cameras are capable of holding hundreds of images and

---

[1]      I investigated a 2007 case filed in the Jacksonville Division of the Middle District of Florida in which I executed a federal search warrant at a residence and several computer hard disk drives were seized.  Many images and videos of child pornography were discovered on these hard disk drives.  Forensic analysis of these hard disk drives revealed that the owner (defendant) had converted 15-year-old Polaroid photographs depicting child pornography into digital images by scanning them onto his computer.  Moreover, the analysis revealed that the owner (defendant) had made VHS videotapes containing child pornography, and then years later displayed them on a large flat screen monitor and filmed the monitor with a digital camera.  Thus, the owner (defendant) successfully converted traditional photos and VHS videos into digital photographs and videos that could be stored and easily traded over the Internet.

videos. A device known as a modem allows any computer to connect to another computer through the use of telephone, cable, or wireless connection. Electronic contact can be made to literally millions of computers around the world.

9.     A computer's ability to store images in digital form makes the computer itself an ideal repository for child pornography. The size of the electronic storage media, that is, the hard disk drive used in home computers has grown tremendously within the last several years. These hard disk drives can store hundreds of thousands of images at very high resolution.

10.     The World Wide Web of the Internet affords collectors of child pornography several different venues for obtaining, viewing and trading child pornography in a relatively secure and anonymous fashion.

11.     Collectors and distributors of child pornography frequently use online resources to retrieve and store child pornography, including services offered by Internet Portals such as Yahoo!, Hotmail, and Google, among others. The online services allow a user to set up an account with a remote computing service that provides email services as well as electronic storage of computer files in any variety of formats. A user can set up an online storage account from any computer with access to the Internet. Evidence of such online storage of child pornography is often found on the user's computer. Even in cases where online storage is used, however, evidence of child pornography can be found on the user's computer in most cases.

12.     As is the case with most digital technology, communication by way of computer can be saved or stored on the computer used for these purposes. Storing this information can be intentional, *i.e.*, by saving an email as a file on the computer or

12

saving particular website locations in, for example, "bookmarked" files. Digital information, images and videos can also be retained unintentionally, *e.g.*, traces of the path of an electronic communication may be automatically stored in many places (*e.g.*, temporary files or ISP client software, among others). Often, a computer will automatically save transcripts or logs of electronic communications between its user and other users that have occurred over the Internet. These logs are commonly referred to as "chat logs." Some programs allow computer users to trade images while simultaneously engaging in electronic communications with each other. This is often referred to as "chatting," or "instant messaging." Based upon my training and experience, as well as conversations with other law enforcement officers and computer forensic examiners, I know that these electronic "chat logs" often have great evidentiary value in child pornography investigations, as they record communication in transcript form, show the date and time of such communication, and also may show the dates and times when images of child pornography were traded over the Internet. In addition to electronic communications, a computer user's internet activities generally leave traces or "footprints" in the web cache and history files of the browser used. A forensic examiner often can recover evidence suggesting whether a computer contains P2P software, when the computer was sharing files, and some of the files which were uploaded or downloaded. Such information is often maintained on a computer for long periods of time until overwritten by other data.

## SEARCH AND SEIZURE OF COMPUTER SYSTEMS

13. Based upon my training and experience, as well as conversations with other experienced law enforcement officers, I know that searches and seizures of

13

evidence from computers commonly require agents to download or copy information from the computers and their components, or seize most or all computer items (computer hardware, computer software, and computer related documentation) to be processed later by a qualified computer expert, or analyst, in a laboratory or other controlled environment. This is almost always true because of the following:

a. Computer storage devices (*e.g.*, hard drives, compact disks ("CDs"), diskettes, tapes, and others) can store the equivalent of thousands of pages of information. Especially when the user wants to conceal criminal evidence, he or she often stores it in random order with deceptive file names. This requires searching authorities to examine all the stored data to determine whether it is included in the warrant. This sorting process can take days or weeks, depending on the volume of data stored, and it would be generally impossible to accomplish this kind of data search on site; and

b. Searching computer systems for criminal evidence is a highly technical process requiring expert skill and a properly controlled environment. The vast array of computer hardware and software available requires even computer experts to specialize in some systems and applications, so it is difficult to know before a search which expert should analyze the system and its data. The search of a computer system, which includes the use of data search protocols, is an exacting scientific procedure which is designed to protect the integrity of the evidence and to recover

14

hidden, erased,[2] compressed, password protected, or encrypted files. Since computer evidence is extremely vulnerable to tampering or destruction (which may be caused by malicious code or normal activities of an operating system), the controlled environment of a laboratory is essential to its complete and accurate analysis.

14.    In order to fully retrieve data from a computer system, the analyst needs all magnetic storage devices as well as the central processing unit ("CPU"). In cases involving child pornography where the evidence consists partly of graphics files, the monitor(s) may also be essential for a thorough and efficient search due to software and hardware configuration issues. In addition, the analyst needs all the system software (operating systems or interfaces, and hardware drivers) and any applications software which may have been used to create the data (whether stored on hard drives or on external media).

### CHILD PORNOGRAPHY COLLECTOR CHARACTERISTICS

15.    Based on my experience, training, and conversations with other experienced agents who investigate cases involving the sexual exploitation of children, I know that certain common characteristics are often present in individuals who possess, access and view collect ch    pornography on the internet. I have observed and/or learned about the reliability of these commonalities and conclusions involving individuals who possess, access with intent to view, collect, and trade images of child pornography. Based upon my training and experience, and conversations with other

---

[2]    Based on my training and experience, as well as conversations with other law enforcement officers and computer forensic examiners, I know that computer forensic techniques can often recover files, including images and videos of child pornography, that have long been "deleted" from computer media by a computer user.

experienced agents who investigate cases involving the sexual exploitation of children, I know that the following traits and characteristics are often present in individuals who collect child pornography:

      a.    Many individuals who access child pornography using the internet often also trade and collect child pornography. Many individuals who access and collect child pornography have a sexual attraction to children. They receive sexual gratification and satisfaction from sexual fantasies fueled by sexually explicit depictions of children.

      b.    Many individuals who access and collect child pornography also collect other sexually explicit materials, which may consist of photographs, magazines, motion pictures, video tapes, books, slides, computer graphics or digital or other images for their own sexual gratification. Many of these individuals also access and collect child erotica, which may consist of images or text that do not meet the legal definition of child pornography but which nonetheless fuel their deviant sexual fantasies involving children.

      c.    Many individuals who access and collect child pornography often seek out like minded individuals, either in person or on the Internet, to share information and trade depictions of child pornography and child erotica as a means of gaining status, trust, acceptance, and support. This contact also helps these individuals to rationalize and validate their deviant sexual interest in children and associated behavior. The different Internet based vehicles used by such individuals to communicate with each other include, but are not limited to, P2P, email, email groups, bulletin boards, Internet Relay Chat Rooms (IRC), newsgroups, instant messaging, and other similar vehicles.

      d.     Many individuals who access and collect child pornography maintain books, magazines, newspapers and other writings (which may be written by the collector), in hard copy or digital medium, on the subject of sexual activities with children as a way of understanding their own feelings toward children, justifying those feelings and finding comfort for their illicit behavior and desires. Such individuals often do not destroy these materials because of the psychological support that they provide.

      e.     Many individuals who access and collect child pornography often collect, read, copy or maintain names, addresses (including email addresses), phone numbers, or lists of persons who have advertised or otherwise made known in publications and on the Internet that they have similar sexual interests. These contacts are maintained as a means of personal referral, exchange or commercial profit. These names may be maintained in the original medium from which they were derived, in telephone books or notebooks, on computer storage devices, or merely on scraps of paper.

      f.     Many individuals who access and collect child pornography, whether they personally produced it or obtained it from a third party, rarely, if ever, dispose of their sexually explicit materials and may go to great lengths to conceal and protect them from discovery, theft, or damage. These individuals view their sexually explicit materials as prized and valuable materials, even as commodities to be traded with other like-minded individuals over the Internet. As such, they tend to maintain or "hoard" their visual depictions of child pornography for long periods of time in the privacy and security of their homes or other secure locations. When these individuals relocate and move from one residence to another, they tend to take the sexually explicit

17

materials that they have collected with them to their new residence.  These individuals

may protect their illicit materials by passwords, encryption, and other security measures;

save it on movable media such as CDs, DVDs, flash memory, thumb drives, and

removable hard drives, which can be very small in size, including as small as a postage

stamp, and easily secreted; or send it to third party image storage sites via the Internet.

Based on my training and experience, as well as my conversations with other

experienced law enforcement officers who conduct child exploitation investigations, I

know that individuals who possess, access with intent to view, receive, and/or distribute

child pornography by computer using the Internet often maintain and/or possess the

items listed in Attachment B.

    16.    As stated in substance above and based upon my training and

experience, as well as my conversations with other experienced law enforcement

officers, I know that individuals who access, collect and trade child pornography often

do not willfully dispose of their child pornography collections, even after contact with law

enforcement officials.  For example, during the course of an investigation that I

conducted in 2007 in the Middle District of Florida, the subject had his residence

searched pursuant to a federal search warrant and his computer and digital storage

media seized by the FBI.  The search of his computer and other computer storage

media revealed the subject knowingly possessed several thousand images of child

pornography.  The subject retained an attorney and both were made aware of the

ongoing investigation into the subject's commission of federal child pornography

offenses.  Approximately two months later, the subject was arrested on federal child

pornography possession charges.  After the subject's arrest, the FBI obtained a laptop

computer owned by the subject's employer but possessed and used by the subject both before and after the execution of the search warrant at his residence.  Subsequent forensic examination of this computer revealed that the subject had downloaded, possessed and viewed images of child pornography numerous times *after* the execution of the search warrant and before his arrest.

## BACKGROUND OF INVESTIGATION AND
## FACTS ESTABLISHING PROBABLE CAUSE

17.    Through a written communication dated May 26, 2015 and an investigative lead set for the FBI Jacksonville Field Office in the FBI case management system, I know that JASON DEAN BARNES (date of birth 09/26/1975) and/or another user of the internet account resolving back to 6953 Solomon Road, Jacksonville, Florida 32234 has been linked to an online community of individuals who regularly send and receive child pornography via a website that operated on an anonymous online network. The website is described below and referred to herein as "Website A."[3]   There is probable cause to believe that BARNES or a user of the Internet account at 6953 Solomon Road, Jacksonville, Florida 32234 knowingly accessed with the intent to view, receive and/or distribute child pornography on "Website A."

---

[3]     The actual name of "Website A" is known to law enforcement.  Disclosure of the name of the site would potentially alert its members to the fact that law enforcement action is being taken against the site and its users, potentially provoking members to notify other members of law enforcement action, flee, and/or destroy evidence.  Accordingly, for purposes of the confidentiality and integrity of the ongoing investigation involved in this matter, specific names and other identifying factors have been replaced with generic terms and the website will be identified as "Website A."

19

## The Network[4]

18. Based on the aforementioned written communication dated May 26, 2015 and provided to me by SA Alfin and in a subsequent telephone conversation, I have learned that "Website A" operated on a network ("the Network") available to Internet users who are aware of its existence. The Network is designed specifically to facilitate anonymous communication over the Internet. In order to access the Network, a user must install computer software that is publicly available, either by downloading software to the user's existing web browser, downloading free software available from the Network's administrators or downloading a publicly-available third-party application.[5] Using the Network prevents someone attempting to monitor an Internet connection from learning what sites a user visits and prevents the sites the user visits from learning the user's physical location. Because of the way the Network routes communication through other computers, traditional IP identification techniques are not viable.

19. Websites that are accessible only to users within the Network can be set up within the Network and "Website A" was one such website. Accordingly, "Website A"

---

[4] The actual name of the Network is known to law enforcement. The network remains active and disclosure of the name of the network would potentially alert its members to the fact that law enforcement action is being taken against the network, potentially provoking members to notify other members of law enforcement action, flee, and/or destroy evidence. Accordingly, for purposes of the confidentiality and integrity of the ongoing investigation involved in this matter, specific names and other identifying factors have been replaced with generic terms and the network will be identified as "the Network."

[5] Users may also access the Network through so-called "gateways" on the open Internet, however, use of those gateways does not provide users with the full anonymizing benefits of the Network.

20

could not generally be accessed through the traditional Internet.[6]  Only a user who had installed the appropriate software on the user's computer could access "Website A." Even after connecting to the Network, however, a user had to know the exact web address of "Website A" in order to access it.  Websites on the Network are not indexed in the same way as websites on the traditional Internet.  Accordingly, unlike on the traditional Internet, a user could not simply perform a Google search for the name of "Website A," obtain the web address for "Website A," and click on a link to navigate to "Website A."  Rather, a user had to have obtained the web address for "Website A" directly from another source, such as other users of "Website A," or from online postings describing both the sort of content available on "Website A" and its location.  Accessing "Website A" therefore required numerous affirmative steps by the user, making it extremely unlikely that any user could have simply stumbled upon "Website A" without first understanding its content and knowing that its primary purpose was to advertise and distribute child pornography.

20.   The Network's software protects users' privacy online by bouncing their communications around a distributed network of relay computers run by volunteers all around the world, thereby masking the user's actual IP address which could otherwise be used to identify a user.

21.   The Network also makes it possible for users to hide their locations while offering various kinds of services, such as web publishing, forum/website hosting, or an

---

[6]      Due to a misconfiguration, prior to February 20, 2015, Website A was occasionally accessible through the traditional Internet.  In order to access Website A in that manner, however, a user would have had to know the exact IP address of the computer server that hosted Website A, which information was not publicly available. As of on or about February 20, 2015, Website A was no longer accessible through the traditional Internet.

instant messaging server. Within the Network itself, entire websites can be set up which operate the same as regular public websites with one critical exception - the IP address for the web server is hidden and instead is replaced with a Network-based web address. A user can only reach such sites if the user is using the Network client and operating in the Network. Because neither a user nor law enforcement can identify the actual IP address of the web server, it is not possible to determine through public lookups where the computer that hosts the website is located. Accordingly, it is not possible to obtain data detailing the activities of the users from the website server through public lookups.

### Description of "Website A" and its Content

22.     SA Alfin informed me via both the aforementioned written and telephonic communications that "Website A" was a child pornography bulletin board and website dedicated to the advertisement and distribution of child pornography and the discussion of matters pertinent to the sexual abuse of children, including the safety and security of individuals who seek to sexually exploit children online. On or about February 20, 2015, the computer server hosting "Website A" was seized from a web-hosting facility in Lenoir, North Carolina. The website was operated by the FBI in Newington, Virginia, from February 20, 2015, until March 4, 2015, at which time "Website A" ceased to operate. Between February 20, 2015, and March 4, 2015, law enforcement agents acting pursuant to an order of the United States District Court for the Eastern District of Virginia monitored electronic communications of users of "Website A." Before, during, and after its seizure by law enforcement, law enforcement agents viewed, examined and documented the contents of "Website A," which are described below.

22

23.     According to statistics posted on the site, "Website A" contained a total of 117,773 posts, 10,622 total topics, and 214,898 total members as of March 4, 2015. The website appeared to have been operating since approximately August 2014, which is when the first post was made on the message board. In red and bold lettering at the top of the main page was a warning that "anybody talking about the LEA will be BANNED, No Warnings." Based on my training and experience, "LEA" likely refers to law enforcement related activity, about which users and administrators of child-pornography websites are regularly concerned. On the main page of the site, located to either side of the site name were two images depicting partially clothed prepubescent girls with their legs spread apart, along with the text underneath stating, "No cross-board reposts, .7z preferred, encrypt filenames, include preview, Peace out." Based on my training and experience, I know that: "no cross-board reposts" refers to a prohibition against material that is posted on other websites from being "re-posted" to "Website A;" and ".7z" refers to a preferred method of compressing large files or sets of files for distribution. Two data-entry fields with a corresponding "Login" button were located to the right of the site name. Located below the aforementioned items was the message, "Warning! Only registered members are allowed to access the section. Please login below or 'register an account' (a hyperlink to the registration page) with "[Website A]." Below this message was the "Login" section, consisting of four data-entry fields with the corresponding text, "Username, Password, Minutes to stay logged in, and Always stay logged in."

24.     Upon accessing the "register an account" hyperlink, there was a message that informed users that the forum required new users to enter an email address that

23

looks to be valid. However, the message instructed members not to enter a real email address. The message further stated that once a user registered (by selecting a user name and password), the user would be able to fill out a detailed profile. The message went on to warn the user "[F]or your security you should not post information here that can be used to identify you." The message further detailed rules for the forum and provided other recommendations on how to hide the user's identity for the user's own security.

25.     After accepting the above terms, registration to the message board then required a user to enter a username, password, and e-mail account; although a valid e-mail account was not required as described above.

26.     After successfully registering and logging into the site, the user could access any number of sections, forums, and sub-forums. Some of the sections, forums, and sub-forums available to users included: (a) How to; (b) General Discussion; (c) [Website A] information and rules; and (d) Security & Technology discussion. Additional sections, forums, and sub-forums included (a) Jailbait – Boy;  (b) Jailbait – Girl; (c) Preteen – Boy; (d) Preteen – Girl; (e) Pre-teen Videos – Girl HC; (f) Pre-teen Videos – Boys HC; (g) Toddlers; and (h) Kinky Fetish – Scat.  Based on my training and experience, I know that "jailbait" refers to underage but post-pubescent minors; the abbreviation "HC" means hardcore (i.e., depictions of penetrative sexually explicit conduct); and "scat" refers to the use of feces in various sexual acts, watching someone defecating, or simply seeing the feces. An additional section and forum was also listed in which members could exchange usernames on a Network-based instant messaging

24

service that SA Alfin informed me was commonly used by subjects engaged in the online sexual exploitation of children.

27.     A review of the various topics within the above forums revealed each topic contained a title, the author, the number of replies, the number of views, and the last post. The "last post" section of a particular topic included the date and time of the most recent posting to that thread as well as the author. Upon accessing a topic, the original post appeared at the top of the page, with any corresponding replies to the original post included in the post thread below it. Typical posts appeared to contain text, images, thumbnail-sized previews of images, compressed files (such as Roshal Archive files, commonly referred to as ".rar" files, which are used to store and distribute multiple files within a single file), links to external sites, or replies to previous posts.

28.     A review of the various topics within the "[Website A] information and rules," "How to," "General Discussion," and "Security & Technology discussion" forums revealed that the majority contained general information in regards to the site, instructions and rules for how to post, and welcome messages between users.

29.     A review of topics within the remaining forums revealed the majority contained discussions about, and numerous images that appeared to depict, child pornography and child erotica depicting prepubescent girls, boys, and toddlers. Examples of these are as follows:

a.     On February 3, 2015, a user posted a topic entitled "Buratino-06" in the forum "Pre teen -- Videos - Girls HC" that contained numerous images depicting child pornography of a prepubescent or early pubescent girl. One of these images depicted the girl being orally penetrated by the penis of a naked male;

25

b.      On January 30, 2015, a user posted a topic entitled "Sammy" in the forum "Pre-teen – Photos – Girls" that contained hundreds of images depicting child pornography of a prepubescent girl. One of these images depicted the female being orally penetrated by the penis of a male; and

c.      On September 16, 2014, a user posted a topic entitled "9yo Niece - Horse.mpg" in the "Pre-teen Videos - Girls HC" forum that contained four images depicting child pornography of a prepubescent girl and a hyperlink to an external website that contained a video file depicting what appeared to be the same prepubescent girl. Among other things, the video depicted the prepubescent female, who was naked from the waist down with her vagina and anus exposed, lying or sitting on top of a naked adult male, whose penis was penetrating her anus.

30.      A list of members, which was accessible after registering for an account, revealed that approximately 100 users made at least 100 posts to one or more of the forums. Approximately 31 of these users made at least 300 posts. In total, "Website A" contained thousands of postings and messages containing child pornography images. Those images included depictions of nude prepubescent minors lasciviously exposing their genitals or engaged in sexually explicit conduct with adults or other children.

31.      "Website A" also included a feature referred to as "[Website A] Image Hosting." This feature of "Website A" allowed users of "Website A" to upload links to images of child pornography that are accessible to all registered users of "Website A." On February 12, 2015, an FBI Agent accessed a post on "Website A" titled "Giselita" which was created by a particular "Website A" user. The post contained links to images stored on "[Website A] Image Hosting." The images depicted a prepubescent girl in

26

various states of undress. Some images were focused on the nude genitals of a prepubescent girl. Some images depicted an adult male's penis partially penetrating the vagina of a prepubescent girl.

32. Text sections of "Website A" provided forums for discussion of methods and tactics to use to perpetrate child sexual abuse. For example, on January 8, 2015, a user posted a topic entitled "should i proceed?" in the forum "Stories   Non Fiction" that contained a detailed accounting of an alleged encounter between the user and a 5 year old girl. The user wrote "...it felt amazing feeling her hand touch my dick even if it was through blankets and my pajama bottoms..." The user ended his post with the question, "should I try to proceed?" and further stated that the girl "seemed really interested and was smiling a lot when she felt my cock." A different user replied to the post and stated, "...let her see the bulge or even let her feel you up...you don't know how she might react, at this stage it has to be very playful..."

## Court Authorized Use of Network Investigative Technique

33. Websites generally have Internet Protocol ("IP") address logs that can be used to locate and identify the site's users. In such cases, after the seizure of a website whose users were engaging in unlawful activity, law enforcement could review those logs in order to determine the IP addresses used by users of "Website A" to access the site. A publicly available lookup could then be performed to determine what Internet Service Provider ("ISP") owned the target IP address. A subpoena could then be sent to that ISP to determine the user to which the IP address was assigned at a given date and time.

27

34.    However, because of the Network software utilized by "Website A," any such logs of user activity would contain only the IP address of the last computer through which the communications of "Website A" users were routed before the communications reached their destinations.  The last computer is not the actual user who sent the communication or request for information, and it is not possible to trace such communications back through the Network to that actual user.  Such IP address logs therefore could not be used to locate and identify users of "Website A."

35.    Accordingly, on February 20, 2015, the same date "Website A" was seized, the United States District Court for the Eastern District of Virginia authorized the issuance of a warrant to allow law enforcement agents to deploy a particular Network Investigative Technique ("NIT") on "Website A" in an attempt to identify the actual IP addresses and other identifying information of computers used to access "Website A."  I have received a copy of this search warrant, together with its supporting affidavit, and I have reviewed it in its entirety.  Pursuant to that court authorization, between February 20, 2015, and approximately March 4, 2015, each time any user or administrator logged into "Website A" by entering a username and password, the FBI was authorized to deploy the NIT that would send one or more communications to the user's computer.  Those communications were designed to cause the receiving computer to deliver to a computer known to or controlled by law enforcement, certain data that would potentially enable law enforcement to identify the computer, its location, other information about the computer, and the user of the computer accessing "Website A."  That data included: the computer's actual IP address, and the date and time that the NIT determined what that IP address was; a unique identifier generated by the NIT (e.g., a series of numbers,

28

letters, and/or special characters) to distinguish the data received from that of other computers; the type of operating system running on the computer, including type (e.g., Windows), version (e.g., Windows 7), and architecture (e.g., x86); information about whether the NIT had already been delivered to the computer; the computer's Host Name; the computer's active operating system username; and the computer's MAC address.

### "abcdefghijk123" on "Website A"

36.    According to data provided to me by SA Alfin and obtained from logs on "Website A," monitoring by law enforcement, and the deployment of a NIT, a user with the user name "abcdefghijk123" engaged in the following activity on "Website A": The profile page of user "abcdefghijk123" indicated this user originally registered an account on "Website A" on August 29, 2014. Profile information on "Website A" may include contact information and other information that is supplied by the user. It also contains information about that user's participation on the site, including statistical information about the user's posts to the site and a categorization of those posts. According to the user "abcdefghijk123" profile, this user was a "Newbie" Member of "Website A." Further, according to the Statistics section of this user's profile, the user "abcdefghijk123" had been actively logged into the website for a total of 82 hours between the dates of November 2014 and March 4, 2015.

### IP Address and Identification of User "abcdefghijk123" on "Website A"

37.    According to data provided to me by SA Alfin and obtained from logs on "Website A," monitoring by law enforcement, and the deployment of a NIT, on March 3, 2015, the user "abcdefghijk123" engaged in the following activity on "Website A" from IP

29

address 71.203.137.55, on a laptop computer with a MAC address of 9C4E36862604, and a logon ID of "jasoncristy:

     a.     During the session described below, this user browsed "Website A" after logging into "Website A" with a username and a password.

     b.     On March 3, 2015, the user "abcdefghijk123" with IP address 71.203.137.55 accessed a posted thread (or link) entitled "13yo bates with sound." Among other things, this post contained two posts to a link and password that were provided by the original poster.

     c.     During the following additional sessions, the user "abcdefghijk123" also browsed "Website A" after logging into "Website A" with a username and password. During these sessions, the user's IP address information was not collected.

     d.     On February 28, 2015, the user "abcdefghijk123" accessed a post that contained a link to a set of thumbnail images to a video titled "12 yo cutie pops out her swollen clit.mp4." The young girl is being recorded from a camera that is focused on her vagina while she exposed her vagina and digitally penetrates her vagina in front of the camera. The young girl has on a white shirt with multi-colored flowers on it and she has brown shoulder-length hair.

     e.     On March 3, 2015, at approximately 11:48 p.m. UTC[7], the user "abcdefghijk123" accessed a post that contained a set of thumbnail images from a video file where the images depict an adult female and a 3-5 year old young female toddler.

---

[7]     Based on my training and experience, I know that UTC is an acronym for "Coordinated Universal Time." It is generally considered interchangeable with "Greenwich Mean Time" (GMT).

The adult female can be seen digitally penetrating the toddler while also licking the toddler's vagina. The adult female is wearing a purple shirt and has brown hair.

38.   Using publicly available websites, FBI Special Agents and analysts assigned to the MCCU were able to determine that the above IP Address was operated by the Internet Service Provider ("ISP") Comcast.

39.   On March 13, 2015, an administrative subpoena was served to Comcast Legal Response Center by FBI Supervisory Special Agent J. Brooke Donahue requesting information related to the user who was assigned to the above IP address on March 3, 2015 at 7:01 p.m. UTC. According to the information received from Comcast Legal Response Center on March 16, 2015 in response to the subpoena, which I have reviewed, the account registered to JASON BARNES was receiving internet service at 6953 Solomon Rd., Baldwin, FL 32234-2817 at the above time and date via IP address 71.203.137.55. This account was still active on March 16, 2015.

40.   Following receipt of the above information in written form and that contained on a DVD prepared by FBI personnel at the MCCU, all of which I have reviewed, FBI Staff Operations Specialist Lucy Spagnuolo conducted a query of the Florida Driver And Vehicle Information Database (DAVID) for JASON BARNES. This query yielded a positive response for JASON DEAN BARNES, residing at 6953 Solomon Road, Jacksonville, Florida 32234. A DAVID query based on the address also located records for Cristy Ann Barnes (dob 04/11/1989) and Charlotte Burch Shaw (dob 09/20/1943). SOS Spagnuolo then conducted a query of the Jacksonville Electric Authority whose records indicated utility service under the name of JASON D. BARNES

31

is provided at 6953 Solomon Road, Baldwin, Florida 32234 and service was current as of May 21, 2015[8].

41.     On May 27, 2015, FBI field photographer Jon Fletcher and I conducted surveillance on the residence located at 6953 Solomon Road, Jacksonville, Florida 32234 which is more fully described in Attachment A.  Parked in front of the mobile home were a beige colored Chevrolet pickup truck with an identified Florida license plate and a silver Chrysler PT Cruiser with an identified Florida registration plate. According to DAVID records, the registration for these two vehicles resolved back to JASON BARNES and Cristy Barnes, respectively.

### CONCLUSION

42.     Based on the foregoing, I have probable cause to believe that one or more persons has used and is using one or more computers and/or electronic storage media located in the residence at 6953 Solomon Road, Jacksonville, Florida 32234 more fully described in Attachment A to this affidavit, to, among other things, possess and/or access with intent to view child pornography.  Therefore, I have probable cause to believe that one or more individuals, using the residence described above has violated 18 U.S.C. §§ 2252 and 2252A.  Additionally, I have probable cause to believe that fruits, evidence, and instrumentalities of violations of 18 U.S.C. §§ 2252 and 2252A, including at least one computer and other electronic storage media containing images of child pornography and/or evidence related to the access of with intent to view child

---

[8]     A query of the website for the U.S. Postal Service, www.usps.gov, indicated that zip code 32234 can be used for mail addressed to Maxwell, Baldwin or Jacksonville, Florida.

pornography, including the items more fully described in Attachment B to this affidavit (which is incorporated by reference herein), will be located in this residence.

43.     Accordingly, I respectfully request a search warrant be issued by this Court authorizing the search and seizure of the items listed in Attachment B.

### REQUEST FOR AUTHORITY FOR "NO-KNOCK" AND "ANYTIME" ENTRY

44.     Based on my communications with SA Alfin and my review of the information set forth herein, I know that the rules posted on "Website A" by the primary administrator state that all material shared via "Website A" must be encrypted. Specifically, on September 16, 2014, an administrator of "Website A" created a topic on the website entitled "Windows Security Guide." The topic contained, among other information, instructions on securely deleting data and creating encrypted partitions. Specifically, the administrator instructed users to "install and keep everything cp related, including [the Network software] and programs on the Truecrypt container." The topic post contained numerous additional instructions for modifying or disabling features of the operating system that might assist police and other criminal investigators in performing forensic exams on seized computers.

45.     Based upon the totality of the information in this affidavit as well as my training and experience, I respectfully request that this Court authorize a "no-knock" entry when executing the requested search warrant at the subject residence. I have reasonable suspicion to believe that, if law enforcement agents knock and announce their presence prior to entry, such action would inhibit the effective investigation of the subject crime(s) by allowing the permanent concealment and/or destruction of evidence. As set forth herein, I have reasonable suspicion that the subject(s) under investigation

33

may use encryption software which, if activated, may prevent law enforcement from obtaining the information stored in the computers which are subject to seizure pursuant to the requested search warrant. If, at the time agents enter to execute this search warrant, an encrypted computer is powered off or locked by the subject(s), then the encryption would be activated and it would be difficult or even impossible to search that device without the necessary password or pass phrase. I am aware of instances where law enforcement has encountered an encrypted device or devices during the course of a court authorized search of a residence, and been unable to successfully de crypt and search the device(s). I am also aware of investigations in which the subject(s) have attempted to delete digital evidence when law enforcement agents have announced their presence prior to entry during the execution of a search warrant. To avoid the scenario where agents encounter an encrypted computer or computers and/or the attempted deletion of digital evidence, I, together with other law enforcement agents, wish to execute this warrant at a time when the subject(s) under investigation is/are at home and computers at the subject residence are likely to be up and running and being used to send or receive data over the Internet. Precautions also need to be taken to ensure that the subject(s) under investigation does/do not activate encryption and do not attempt to delete digital evidence when agents arrive at the residence to serve the warrant. Activating such encryption can be as simple as pressing a button on a computer or powering a computer down, which takes a matter of seconds. Accordingly, if the subject(s) under investigation or others in the residence is/are aware of the presence of the search team prior to the actual entry of the agents who are conducting the search, encryption software can be easily activated and deletion of digital evidence

34

can be commenced.   Accordingly, in order to minimize the possibility that agents will encounter encrypted computers, I respectfully request that this warrant be a "no knock" and "day and/or night hours" warrant, allowing agents to make a dynamic entry into the residence without first announcing their presence, in order to prevent the activation of encryption software and the destruction of digital evidence, at any time of the day or night at which agents can determine that the subject(s) under investigation is/are likely at the residence and data is being sent/received via the Internet.

46.     SA Alfin has informed me that "no-knock" and "day and/or night hours" search warrants have been issued by other Courts and successfully used in this investigation.  For example, on February 20, 2015, the primary administrator of "Website A" was arrested by FBI agents after the execution of a "no knock" and "day and/or night hours" search warrant.  After the administrator was detained, on-scene personnel determined that he had stored data pertaining to "Website A" on an device that was capable of being encrypted.  Due to the successful execution of the "no knock"

and "day and/or night hours" warrant, FBI were able to successfully seize the device(s)

containing the relevant evidence pertaining to "Website A" in a decrypted state.

_____

LAWRENCE S. MEYER, Special Agent
Federal Bureau of Investigation

Subscribed and sworn to before me this
_27th_ day of July, 2015, at Jacksonville, Florida.

_____

MONTE C. RICHARDSON
United States Magistrate Judge

36

# ATTACHMENT A

## PREMISES TO BE SEARCHED

The residence located at 6953 Solomon Road, Jacksonville, Florida 32234 is a "single wide" prefabricated, single story structure of the type often referred to as a mobile home. The exterior walls are comprised of vertical white vinyl panels over three tan colored horizontal panels which define the lower edge of the exterior walls. Four wooden steps lead up to a porch which runs along about two-thirds length of the home. The front door is tan in color and is offset to the right of center as one observes the residence from the road. To the immediate right of the door is a porch light. To the right of the door is a window flanked by tan colored shutters. A porch swing is located in front of this window. To the left of the front door are two double pane windows, each bordered by tan colored shutters. Further to the left is another set of double windows. Decorative split rail fences are in front of the residence with a break between the two fence sections to allow access to the steps leading to the front porch and door. A brown colored, three rail wood fence encloses the yard. Two large leafy trees grow in the front yard. Though there is no discernible driveway, in the front yard alongside the road is a black rural style mailbox mounted on an unfinished wooden post. Affixed to one side of the mailbox are the numbers "6953." Solomon Road is a two lane dirt road along this section of roadway.

**ATTACHMENT B**

## LIST OF ITEMS TO BE SEIZED AND SEARCHED

1.    Any and all computer(s), computer hardware, computer software, electronic storage media (including any and all disk drives, compact disks, flash drives, cellular telephones, "smart" phones (such as an Apple iPhone), electronic tablets (such as an Apple iPad), personal digital assistants (PDA), digital cameras and/or memory cards, or any other device capable of electronic storage of data and/or images), computer-related documentation, computer passwords and data-security devices, videotapes, video-recording devices, video-recording players, and video display monitors that are or may be used to:  visually depict child pornography or child erotica; display or access information pertaining to a sexual interest in child pornography; display or access information pertaining to sexual activity with children; or possess and/or access with intent to view child pornography or child erotica.

2.    Any and all computer software, including programs to run operating systems, applications, such as word processing, graphics, and communications programs, including peer-to-peer software, that may be or are used to: visually depict child pornography or child erotica, display or access information pertaining to a sexual interest in child pornography; display or access information pertaining to sexual activity with children; or possess and/or access with intent to view child pornography or child erotica.

3.    For any computer or storage medium whose seizure is otherwise authorized by this warrant, and any computer or storage medium that contains or in

which is stored records or information that is otherwise called for by this warrant (hereinafter, "COMPUTER"):

a.     evidence of who used, owned, or controlled the COMPUTER at the time the things described in this warrant were created, edited, or deleted, such as logs, registry entries, configuration files, saved usernames and passwords, documents, browsing history, user profiles, email, email contacts, "chat," instant messaging logs, photographs, and correspondence;

b.     evidence of software that would allow others to control the COMPUTER, such as viruses, Trojan horses, and other forms of malicious software, as well as evidence of the presence or absence of security software designed to detect malicious software;

c.     evidence of the lack of such malicious software;

d.     evidence indicating how and when the computer was accessed or used to determine the chronological context of computer access, use, and events relating to crime under investigation and to the computer user;

e.     evidence indicating the computer user's state of mind as it relates to the crime under investigation;

f.     evidence of the attachment to the COMPUTER of other storage devices or similar containers for electronic evidence;

g.     evidence of counter-forensic programs (and associated data) that are designed to eliminate data from the COMPUTER;

h.     evidence of the times the COMPUTER was used;

2

      i.     passwords, encryption keys, and other access devices that may be necessary to access the COMPUTER;

      j.     documentation and manuals that may be necessary to access the COMPUTER or to conduct a forensic examination of the COMPUTER;

      k.     records of or information about Internet Protocol addresses used by the COMPUTER; and

      l.     records of or information about the COMPUTER's Internet activity, including firewall logs, caches, browser history and cookies, "bookmarked" or "favorite" web pages, search terms that the user entered into any Internet search engine, and records of user-typed web addresses.

    4.     All routers, modems, and network equipment used to connect computers and/or computer media together and/or to connect computers to the internet, including any programs, protocols, and/or other digital information contained therein;

    5.     Any and all notes, documents, records, or correspondence, in any format and medium (including envelopes, letters, papers, email messages, chat logs and electronic messages, and handwritten notes) pertaining to the possession and/or access with intent to view child pornography as defined in 18 U.S.C. § 2256(8) or to the possession and/or access with intent to view visual depictions of minors engaged in sexually explicit conduct as defined in 18 U.S.C. § 2256(2).

    6.     In any format and medium, all originals, computer files, copies, and negatives of child pornography as defined in 18 U.S.C. § 2256(8), visual depictions of minors engaged in sexually explicit conduct as defined in 18 U.S.C. § 2256(2), or child erotica.

7.     Any and all diaries or address books containing names or lists of names and addresses of individuals who have been contacted by use of the computer(s) or by other means for the purpose of possessing and/or accessing with intent to view child pornography as defined in 18 U.S.C. § 2256(8) or visual depictions of minors engaged in sexually explicit conduct as defined in 18 U.S.C. § 2256(2).

8.     Any and all notes, documents, records, or correspondence, in any format or medium (including envelopes, letters, papers, email messages, chat logs and electronic messages, and handwritten notes), identifying persons transmitting, possessing and/or accessing with intent to view, through interstate or foreign commerce by any means (including the United States Mail or computer) any child pornography as defined in 18 U.S.C. § 2256(8) or any visual depictions of minors engaged in sexually explicit conduct, as defined in 18 U.S.C. § 2256(2).

9.     Any and all notes, documents, records, or correspondence, in any format or medium (including envelopes, letters, papers, email messages, chat logs and electronic messages, other digital data files and web cache information) concerning the possession and/or accessing with intent to view child pornography as defined in 18 U.S.C. § 2256(8) or visual depictions of minors engaged in sexually explicit conduct, as defined in 18 U.S.C. § 2256(2).

10.     Any and all notes, documents, records, or correspondence, in any format or medium (including envelopes, letters, papers, email messages, chat logs and electronic messages, and other digital data files) concerning communications between individuals about child pornography or the existence of sites on the Internet that contain child pornography or that cater to those with an interest in child pornography.

4

11.     Any and all notes, documents, records, or correspondence, in any format or medium (including envelopes, letters, papers, email messages, chat logs and electronic messages, and other digital data files) concerning membership in online groups, clubs, or services that provide or make accessible child pornography to members.

12.     Any and all records, documents, invoices and materials, in any format or medium (including envelopes, letters, papers, email messages, chat logs and electronic messages, and other digital data files) that concern any accounts with an internet service provider.

13.     Any and all records, documents, invoices and materials, in any format or medium (including envelopes, letters, papers, email messages, chat logs and electronic messages, and other digital data files) that concern online storage or other remote computer storage, including software used to access such online storage or remote computer storage, user logs or archived data that show connection to such online storage or remote computer storage, and user logins and passwords for such online storage or remote computer storage.

14.     Any and all cameras, film, videotapes or other photographic equipment capable of being used to possess, store and/or conceal visual depictions of minors engaged in sexually explicit conduct as defined in 18 U.S.C. § 2256(2).

15.     Any and all address books, mailing lists, supplier lists, mailing address labels, and any and all documents and records, in any format or medium (including envelopes, letters, papers, email messages, chat logs and electronic messages, and other digital data files), pertaining to the preparation, purchase, and acquisition of

5

names or lists of names to be used in connection with the possession and/or access with intent to view, through interstate or foreign commerce by any means (including the United States Mail or computer) any child pornography as defined in 18 U.S.C. § 2256(8) or any visual depiction of minors engaged in sexually explicit conduct, as defined in 18 U.S.C. § 2256(2).

16. Any and all documents, records, or correspondence, in any format or medium (including envelopes, letters, papers, email messages, chat logs and electronic messages, and other digital data files), pertaining to occupancy or ownership of the premises to be searched, including rental or lease agreements, mortgage documents, rental or lease payments, utility and telephone bills, mail envelopes, or addressed correspondence.

17. Any and all diaries, notebooks, notes, and any other records reflecting personal contact and any other activities with minors visually depicted while engaged in sexually explicit conduct, as defined in 18 U.S.C. § 2256(2).

18. Any and all documents, records, or correspondence, in any format or medium (including envelopes, letters, papers, email messages, chat logs and electronic messages, and other digital data files), pertaining to the identity of any and all owners and/or users of any computers, computer media and any electronic storage devices discovered in the subject premises and capable of being used to possess, access with intent to view, store and/or conceal visual depictions of minors engaged in sexually explicit conduct as defined in 18 U.S.C. § 2256(2).

As used above, the terms "records" and "information" includes all forms of creation or storage, including any form of computer or electronic storage (such as hard

disks or other media that can store data); any handmade form (such as writing); any mechanical form (such as printing or typing); and any photographic form (such as microfilm, microfiche, prints, slides, negatives, videotapes, motion pictures, or photocopies).

The term "computer" includes all types of electronic, magnetic, optical, electrochemical, or other high speed data processing devices performing logical, arithmetic, or storage functions, including desktop computers, notebook computers, mobile phones, smart phones, tablets, server computers, and network hardware.

The term "storage medium" includes any physical object upon which computer data can be recorded. Examples include hard disks, RAM, floppy disks, flash memory, CD-ROMs, and other magnetic or optical media.

7